UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                    Criminal No. 17-40 (RHK/FLN)

                    Plaintiff,

          v.                                           **REPORT &**
                                                       **RECOMMENDATION**

Antonio Reyes (1),
Katie Reyes (2),

                    Defendants.

_____

Daniel Gerdts, Assistant United States Attorney, for Plaintiff.
Shannon Elkins for Defendant Antonio Reyes.
Daniel Gerdts for Defendant Katie Reyes

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on May 25,

2017, on Defendant Antonio Reyes' motions to suppress (ECF Nos. 50 and 51), Defendant Katie

Reyes' motions to suppress (ECF Nos. 56, 57, 58, and 59), and Defendants' joint request for a

*Franks* hearing (ECF No. 61). This matter was referred to the undersigned for Report and

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. At the hearing, the Government

entered exhibits into evidence, and both the Government and Katie Reyes offered testimony.[1] For

the reasons set forth below, the Court recommends that Antonio Reyes' motion to suppress search

and seizure be **DENIED** (ECF No. 50), and motion to suppress statements be **DENIED as moot**

(ECF No. 51); Katie Reyes' motion to suppress statements and identification be **DENIED as moot**

(ECF Nos. 56, 57), motion to suppress search and seizure be **DENIED** (ECF No. 58), and motion

---

1

     *See* Exhibit and Witness List, ECF No. 66.

to suppress electronic surveillance be **GRANTED** (ECF No. 59); and Defendants' joint request for a *Franks* hearing (ECF No. 61) be **DENIED**.

## I. THE INDICTMENT

On February 23, 2017, a Grand Jury returned an Indictment against Antonio Reyes and Katie Reyes. *See generally* Indictment, ECF No. 10. Antonio Reyes and Katie Reyes are both charged with one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C.§§ 841(a)(1), 841(b)(1)(C), and 846; one count of possession with intent to distribute methamphetamine, in violation of 21 U.S.C.§§ 841(a)(1) and 841(b)(1)(C); and Antonio Reyes additionally is charged with possession of a firearm by an illegal alien, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). *See generally id.* The Indictment alleges that on January 1, 2017, Defendants knowingly conspired to distribute, and possessed with an intent to distribute, a quantity of more than fifty grams of methamphetamine. *See generally id.* According to the Indictment, on January 2, 2017, Antonio Reyes, an alien who is illegally in the United States, possessed a Ruger LCP .380 caliber pistol. *See id.* at 2.

## II. FACTUAL BACKGROUND

On August 15, 2016, Officer Andrew Abrahamson of the East Central Minnesota Drug Task Force ("Task Force") spoke with a confidential informant, identified as CI-11, who claimed that he could purchase methamphetamine from Todd Pedersen at Pedersen's residence in North Branch, Minnesota. CI-11 claimed that he had observed Pedersen in possession of at least ten pounds of methamphetamine. CI-11 informed Abrahamson that Pedersen's supply source was an individual named "Bobby," who used drug runners from Arizona to import the methamphetamine.

On December 12, 2016, Abrahamson spoke with another confidential informant, CI-13, who

corroborated CI-11's statements regarding Bobby's use of Arizona drug runners. Specifically, CI-13 claimed that Defendant Katie Reyes was transporting large quantities of methamphetamine from Arizona to Minnesota. CI-13 claimed that she was friends with Katie Reyes, and had observed Katie Reyes with large amounts of currency and methamphetamine within the last year. CI-13 was believed to be Bobby's former girlfriend, and had been previously signed up as a Task Force informant by filling out forms used by law enforcement.

On December 28, 2016, Abrahamson and another officer met with CI-13, who identified Katie Reyes' photo and provided officers with Katie Reyes' cellular phone number. CI-13 then placed a recorded phone call to Katie Reyes. Katie Reyes stated that she would be traveling to Minnesota soon, and would see Bobby in a few days. Katie Reyes stated that her husband, Defendant Antonio Reyes, had also spoken with Bobby several days before. CI-13 advised Abrahamson that Katie Reyes would not travel to Minnesota without transporting methamphetamine.

On December 29, 2016, based on the information provided by the informants, Abrahamson obtained a tracking warrant to monitor the location of Katie Reyes' cellular phone. On December 31, 2016, Abrahamson received an electronic hit showing that Katie Reyes was traveling through Kansas and Iowa. On January 1, 2017, Abrahamson received another electronic hit showing that Katie Reyes was traveling through Minnesota.

At approximately 10:50 a.m., on January 1, 2017, Task Force officers observed Defendants and their children eating inside a restaurant in Albert Lea, Minnesota. At approximately 12:16 p.m., Minnesota State Trooper Brett Westbrook conducted a traffic stop of the gray Lincoln sedan Defendants were traveling in. Westbrook testified that his radar clocked the vehicle at five miles

over the posted speed limit. Westbrook testifed that after checking Katie Reyes' drivers license, she stated that the Lincoln was a rental, but the rental agreement did not show that the vehicle was insured nor could she produce proof of private vehicle coverage. Westbrook also observed that Defendants' children were not properly restrained in the passenger rear. Approximately fifteen minutes into the traffic stop, Westbrook asked Katie Reyes to step out of the vehicle to give her a copy of a traffic warning for the several violations. After explaining the warning for approximately one minute, Westbrook segued into a series of questions relating to her destination and whether she was transporting drugs. Approximately eighteen-and-a-half minutes into the traffic stop, Katie Reyes consented to a canine sniff of the Lincoln exterior.

Westbook and his canine detection dog, "Skippy" then conducted a canine sniff of the vehicle. Westbrook testified that he and Skippy had been a drug detection team since 2009, and the team is trained to detect methamphetamine, cocaine, heroin, psilocybin mushrooms, and marijuana. Westbrook testified that Skippy's field accuracy rating is 92.7 percent, and that he and Skippy receive annual training through the United States Police K-9 Association ("USPCA").

During the hearing, Westbrook testified that Skippy alerted four times on the rear driver's side during the exterior sniff. Westbrook testified that an alert, "by definition, would be a change in body posture and increased respirations." Transcript 88, ECF No. 73. Westbrook further testified that Skippy is "trained both to alert and to indicate" and sometimes "will alert but not indicate." *Id.*

Trooper Patrick Ignaszewski, who had arrived on scene to assist Westbrook, conducted a second exterior canine sniff with his dog "Jery." Ignaszewski testified that he and Jery also receive annual USPCA training and Jery's field accuracy rating is 93.75 percent. During the traffic stop, recorded by Westbrook's squad car video, Ignaszewski commented that Jery picked "something"

up during his first pass on the rear vehicle driver's side and went back to the same odor source on the second pass, and the odor was "kind of indiscriminate right now." ECF No. 66, Gov't 1, 27:45–28:12. Ignaszewski testified that Jery alerted two times by changing "body posture right from the pattern" and "pulling back on [the] same tail light area, trunk side area on the driver's side." ECF No. 73 at 147. Neither dog indicated by scratching at the pinpoint odor source.

After the canine sniffs, troopers briefly conferred, and then informed Defendants that they would be searching the Lincoln because the dogs had alerted. During the Lincoln search, troopers found a marijuana vaporizer, an open beer bottle, and a pistol. The troopers then consulted with Task Force officers, who instructed them to secure the vehicle pending a search warrant application. Troopers informed Defendants that they would be towing the Lincoln and obtaining a warrant to search it. At that point, Katie Reyes requested her purse, which was still in the Lincoln. Ignaszewski then reentered the vehicle and retrieved the purse, and searched it.

Shortly thereafter, troopers transported the family approximately fifteen miles north to the Minnesota State Patrol Station Office in Owatonna, Minnesota. Antonio Reyes and the Reyes' son were placed in one squad car while Katie Reyes and the Reyes' daughter were placed in another. The Lincoln was driven back to the patrol station by an unknown Task Force officer. The Reyes family was permitted to leave the patrol station later that afternoon after Defendants provided statements. The family then checked into a Crossings hotel in Cambridge, Minnesota.

At 4:46 p.m., that afternoon, Abrahamson obtained a warrant to search the Lincoln. Shortly thereafter, officers searched the vehicle and found a substantial quantity of methamphetamine below the spare tire in the trunk and in a backpack. Officers also found several pistols and ammunition rounds.

On January 2, 2017, Katie Reyes and CI-13 had a brief phone conversation. Later that day,

Defendants were arrested as they were leaving the Cambridge Crossings hotel, in a car driven by CI-13. During Defendants' arrest, officers found a Ruger LCP .380 caliber pistol on Antonio Reyes.

## III. CONCLUSIONS OF LAW

### A.        Moot Motions and Issues (ECF Nos. 51, 56, and 57)

Antonio Reyes moves to suppress the statement he provided to the Task Force on January 1, 2017, and Katie Reyes moves to suppress the statements she provided to the Task Force on January 1, 2017, and January 3, 2017. *See generally* Mot. to Supp. Statements, ECF Nos. 51; 56. The Government represents that it does not intend to offer these statements in its case-in-chief. *See* Opp'n Mem. 2, ECF No. 81. Accordingly, because the Government is not seeking to introduce the contested statements, Defendants' requests to suppress these statements is moot. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (holding that "no evidence obtained as a result of interrogation can be used against" a suspect "unless and until such [Fifth Amendment] warnings and waiver are demonstrated by the prosecution at trial.").

At the hearing, the Government represented that it would likely seek to introduce evidence regarding Katie Reyes' identification by the two informants, CI-11 and CI-13. Katie Reyes moves to suppress these identifications on the "ground that the identification procedure[s] employed by police [were] impermissibly suggestive." Katie Reyes' Supplementary Mot. in Supp. 5, ECF No. 80. However, Katie Reyes "concedes that the nature and length" of her prior relationship with CI-13 renders that identification reliable. ECF No. 80 at 6 (quoting *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012) ("if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinary will be admitted."). As to CI-11's identification, the Government represents that it does not intend "to ask CI-11 to make an in-court identification of Katie Reyes or to ask CI-11 about the photograph that police showed

CI-11, unless the defense first raises the issue." ECF No 81 at 2–3. Given that Katie Reyes concedes that CI-13's identification is reliable, and the Government does not intend to introduce CI-11's identification at trial, the Court concludes that the identification dispute is resolved. *See Perry*, 565 U.S. at 232. Therefore, Katie Reyes' motion to suppress identification is moot.

The Government also represents that it does not intend to introduce evidence obtained from the January 1, 2017, search and seizure of Katie Reyes' cellular phone, evidence obtained from a separate January 2, 2017, vehicle search, nor evidence obtained pursuant to a warrant, *see* ECF No. 66, Gov't Ex. 6, authorizing the electronic search and monitoring Katie Reyes' cellular phone. *See* ECF No. 81 at 2–3. In addition, it does not appear to the Court that Antonio Reyes is contesting the January 2, 2017, seizure of the pistol found on his person. Accordingly, the Court concludes that these matters are either not before the Court or are resolved, and the Court will not address these matters when examining Defendants' remaining suppression motions.

**B.**    **Motions to Suppress Search and Seizure Evidence (ECF Nos. 50 and 58)**

Defendants move to suppress evidence obtained during the January 1, 2017, Lincoln search and seizure. *See generally* Antonio Reyes' Supplementary Mot. in Supp., ECF No. 78; ECF No. 80. Specifically, Defendants argue that the traffic stop and subsequent vehicle searches and seizures violated their Fourth Amendment rights. *See generally id.* The Government counters that the traffic stop was constitutionally authorized because Westbrook observed the Lincoln speeding and the subsequent searches and seizures were supported by probable cause. *See generally* ECF No. 81.

**1.**    **The Traffic Stop**

Defendants challenge the traffic stop of the Lincoln because the stop was "pretextual" and there was "no foundation laid for the accuracy or reliability of the instruments supposedly relied on by the trooper to support the allegation of a speeding violation." ECF No. 80 at 9–10. "The Fourth

Amendment permits an investigative stop of a vehicle if officers have a reasonable suspicion the vehicle or its occupants are involved in criminal activity." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007); *see also Terry v. Ohio*, 392 U.S. 1, 37 (1968); *Orneals v. United States*, 517 U.S. 690, 694 (1996). "A seizure for a traffic violation justifies a police investigation of that violation."*United States v. Rodriguez*, 135 S.Ct. 1609, 1615 (2015). The Untied States Supreme Court has foreclosed "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren v. United States*, 517 U.S. 806, 813 (1996). "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir.1994) (citing *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir.1993)). "If the officer is legally authorized to stop the driver, any additional 'underlying intent or motivation' does not invalidate the stop." *Id.* (quoting *United States v. Cummins*, 920 F.2d 498, 501 (8th Cir.1990)), *cert. denied*, 502 U.S. 962 (1991).

Here, Westbrook testified that although the Task Force was investigating Defendants on suspected narcotics distribution and monitoring their Minnesota travel, he observed the Lincoln traveling five miles over the posted speed limit. Whether the traffic stop of the Lincoln was motivated by an interest in Defendants' suspected ties to narcotic trafficking, rather than the speeding violation, is immaterial. *See Whren*, 517 U.S. at 813. When Westbrook observed the Lincoln speeding, however minor that violation may be, he was justified in conducting a traffic stop of the vehicle on that violation. *See Bloomfield*, 40 F.3d at 915.

## 2. Traffic Stop Duration

Defendants next argue that the traffic stop was impermissibly extended to conduct the canine sniffs. *See* ECF No. 78 at 10–14; ECF No. 80 at 17–19. The Government counters that Westbrook did not impermissibly extend the traffic stop because "the short time spent to obtain Katie Reyes'

consent [to the canine sniff] was justified[,]" and alternatively, the canine sniff was supported by reasonable suspicion. ECF No. 81 at 11.

In *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), the United States Supreme Court held that a canine sniff conducted during a lawful traffic stop does not violate the Fourth Amendment's proscription against unreasonable seizures, but cautioned that a seizure justified solely by an officer observed traffic violation, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of citing the traffic violation. *Id.* In *Rodriguez*, the Nebraska Highway Patrol executed a traffic stop of a Mercury Mountaineer after observing the vehicle veer onto the highway shoulder. *See Rodriguez*, 135 S.Ct. at 1612. After running a records check on the defendant-driver, the officer returned to the Mountaineer and asked the "passenger for his driver's license and began to question him about where the two men were coming from and where they were going." *Id.* at 1613. The officer then provided a warning to the defendant-driver, and gave back the documents provided by the passenger. *See id.* At that point, the defendant-driver and the passenger "had all their documents back and a copy of the written warning. . . [And the officer got all the reason[s] for the stop out of the way[,] ... [and] took care of all the [traffic stop] business." *Id.* Notwithstanding that the officer had completed the business related to the traffic violation, he prolonged the traffic stop by asking the defendant-driver for permission to conduct a canine search, which the defendant-driver declined. *See id.* Nonetheless, officers conducted a canine sniff of the Mountaineer exterior, and when the dog "alerted" officers searched the vehicle, finding a large quantity of methamphetamine. *Id.* Applying the *Caballes* rationale, the Court reversed and remanded the case. *See id.*

The Court reasoned that "an officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the

reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615. Beyond determining "whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (quoting *Caballes*, 543 U.S. at 408); *see also Delaware v. Prouse*, 440 U.S. 648, 658–660 (1979). These checks "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*

Here, the Government argues that Westbrook did not impermissibly extend the traffic stop because the "short time spent to obtain Katie Reyes' consent was justified."[2] ECF No. 81 at 12. That argument was flatly rejected in *Rodriguez. See Rodriguez*, 135 S.Ct. At 1616. The time a traffic stop is constitutionally allocated is the "'time reasonably required to complete [the stop's] mission' . . . a traffic stop 'prolonged beyond' that point is 'unlawful.'" *Id.* at 1616 (quoting *Caballes*, 543 U.S. at 407). Here, the point at which Westbrook had reviewed Katie Reyes' rental agreement and driver's license, and exited the squad car to provide and explain the traffic warning to her, was the point at which the inquiry into the traffic violations concluded. *See id.* at 1615. The *Caballes-Rodriguez* framework did not permit an extension of the traffic stop, no matter how brief or ephemeral, beyond that point, to determine whether Katie Reyes would consent to a canine sniff or any other line of investigatory inquiry. *See id.*

---

2

The Government relies on *United States v. Yang*, 345 F.3d 650, 656 (8th Cir. 2003), for the proposition that the traffic stop extension was justified "to obtain Katie Reyes' consent." ECF No. 81 at 12. The Court rejects the Government's reliance on *Yang* given that the case predates *Rodriguez*, and is no longer good law regarding the question of whether a traffic stop was impermissibly extended.

As Westbrook extended the traffic stop, which had concluded, for the purpose of conducting a separate investigation and to attempt to secure Katie Reyes' consent to a canine sniff, the only question left after *Rodriguez* is whether reasonable suspicion justified the traffic stop extension. *See id.* at 1616. "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard."*United States v. Williams*, 796 F.3d 951, 957 (8th Cir. 2015) (quoting *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008)). The Court must consider "the totality of the circumstances" when determining whether an "officer has a particularized and objective basis to suspect wrongdoing." *Id.* (internal citations omitted); *see also United States v. Arvizu*, 535 U.S. 266, 274 (2002).

Here, Abrahamson and the Task Force had been investigating the methamphetamine distribution of a local drug purveyor named Bobby. Two informants, CI-11 and CI-13, had provided corroborated information regarding the methamphetamine amounts Bobby possessed and his use of Arizona drug runners. CI-13 was believed to be Bobby's former girlfriend and a friend of Katie Reyes. On December 28, 2016, CI-13 and Katie Reyes had a telephone conversation, after which CI-13 reported to the Task Force that Defendants would soon be traveling to Minnesota, that Antonio Reyes had recently spoken with Bobby, and that Defendants would not be coming to Minnesota without transporting methamphetamine. Based on that information the Task Force obtained a tracking warrant, which permitted officers to monitor the location of Katie Reyes' cellular phone. On December 31, 2016, the Task Force received an electronic hit that Katie Reyes' cellular phone was traveling through Kansas and Iowa, further corroborating the informants' information. On the morning of January 1, 2017, the Task Force received another hit showing that the cellular phone was in Minnesota, which officers confirmed by locating Defendants at a Minnesota restaurant.

At the time of the January 1, 2017, traffic stop, the Task Force had information provided by two independent sources connecting Defendants to Bobby, Katie Reyes' cellular phone data showing Defendants' travels from Arizona, the reported source of Bobby's methamphetamine, to Minnesota, and CI-13's statement that Defendants would not be making this trip without transporting methamphetamine. In extending the traffic stop, troopers were operating on more than a mere hunch that the Lincoln contained criminal evidence. *See Williams*, 796 F.3d at 957. Indeed, the tracking warrant provided highly particularized information regarding Defendants' travels, and the corroborated information provided by the informants engendered an objective reason to suspect that Defendants were trafficking in methamphetamine. *See id.* Based on the totality of the circumstances, troopers had reasonable suspicion to extend the traffic stop to conduct a canine sniff of the Lincoln. *See Arvizu*, 535 U.S. at 274.

### 3. Search of the Lincoln

Defendants contest the warrantless roadside search of the Lincoln. *See generally* ECF Nos. 78, 80. Specifically, Defendants contend that "[t]he behavior exhibited by the two drug dogs, Skippy and Jery, did not provide probable cause to search the Reyes's car[,]" in violation of the Fourth Amendment. ECF No. 78 at 9. The Government concedes that without the dog alerts, "troopers did not have probable cause to search the Lincoln," but maintain that the dog alerts established "probable cause to believe the vehicle contained a controlled substance." ECF No. 73 at 177; *see also* ECF No. 81 at 4.

 The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches, meaning searches conducted "without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established

and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). Here, the record is uncontroverted that Westbrook and Ignaszewski's roadside search of the Lincoln was conducted without a warrant. Therefore, the Court must determine if this search fell within a recognized warrant exception. *See id.*

The "automobile exception" to the warrant requirement "authorizes officers to search a vehicle [on the public roads] without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009). The automobile exception applies to "the containers within [the vehicle] where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991). "A dog's identification of drugs in luggage or in a car provides probable cause that drugs are present." *Bloomfield*, 40 F.3d at 919 (citing *United States v. Place*, 462 U.S. 696, 706 (1983)). "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) (citing *United States v. Sundby*, 186 F.3d 873, 875–76 (8th Cir. 1999)).

Here, testimony established that both Skippy and Jery alerted, that each had well over a 90 percent field accuracy, contraband detection rating, and that each received annual USPCA training with their handlers, Westbrook and Ignaszewski. The dog's are reliable and when they alerted, troopers had probable cause to search the Lincoln. *See Donnelly*, 475 F.3d at 955. Defendants argue that because the dog's failed to indicate, rather than alert, troopers lacked probable cause to search the vehicle. At the hearing, counsel for Katie Reyes stated that alert and indication "are used interchangeably by the courts[,]" but that absent an indication, Defendants argue, a canine sniff fails to satisfy probable cause. ECF No. 73 at 175.

Defendants fail to proffer any binding precedent requiring that when a dog is trained to both indicate and alert, it must indicate to satisfy a probable cause showing. Although testimony at the hearing established that alerting and indicating are different canine responses to redolent, narcotic odors, testimony also established Skippy and Jery are trained to do both when they detect the presence of methamphetamine, cocaine, heroin, psilocybin mushrooms, and marijuana, and at times, alert, but not indicate. *See id.* at 88. Because Skippy and Jery reliably alerted to the presence of drugs in the Lincoln, officers had probable cause to search the vehicle, and conduct a warrantless search pursuant to the automobile exception. *See Donnelly*, 475 F.3d at 955.

## C.     Suppression of Electronic Surveillance (ECF No. 59)

Katie Reyes moves for suppression of "two telephone calls made" between her and CI-13 on December 28, 2016, and January 2, 2017. ECF No. 80 at 26.[3] Katie Reyes argues that "there is no evidence [CI-13] was even aware the calls were being recorded, let alone that she consented to the recordings." *Id.* at 27. The Government responds that calls are admissible because CI-13 "agreed to make the calls; . . . the calls were recorded; . . . no one forced CI-13 to make the calls; and . . . CI-13 was signed up as an informant when she made the calls." ECF No. 81 at 15.

As a threshold matter, the Government maintains that Katie Reyes' motion to suppress electronic surveillance is vague regarding the relief sought because the motion "did not specifically seek the suppression of the two consensually recorded calls between CI-13 and Katie Reyes . . . in fact, the defense motion did not even mention the calls[,]" and the issue of phone call suppression was only "first raised . . . at the close of the motions hearing." *Id.* The Government requests that the

---

3

Katie Reyes also originally requested suppression of intercepted communications from January 3, 2017, through January 16, 2017, but has since narrowed the request to only the December 28, 2016, and January 2, 2017, phone calls.

Court "deny the motion without prejudice and to allow Katie Reyes to refile it prior to trial." *Id.* The Government "believes that this would be a prudent way to handle such issues" because the Government, even if given notice by a defendant, would be forced to call at the motions "hearing all of the witnesses who made recorded undercover calls or participated in recorded undercover operations." *Id.* at 16 n.7.

Contrary to the Government's argument, there is nothing vague about the relief requested in Defendant's motion to suppress electronic surveillance, nor is the motion based solely upon boilerplate language. The motion clearly identifies "various recordings of  intercepted telephone conversations in which [Katie Reyes] was a participant." Katie Reyes' Mot. to Supp. Elec. Surveillance 1–2, ECF No. 59. Defendant expressly identifies by date the December 28, 2016, conversation.[4] Although Defendant states that the "bulk of the intercepted communication are from 3-4 January 2017[,]" the motion concludes by stating  that "counsel conferred earlier today, and counsel for the Government will respond appropriately."[5] *Id.* This was clearly sufficient notice to the Government that Defendant was challenging the intercepted phone calls between herself and CI-13. If, as it now appears, the Government contends that the interceptions were lawful because voluntarily consented to by CI-13, it should have been prepared to prove that voluntary consent at the suppression hearing, as required by Eighth Circuit law. *See United States v. Corona-Chavez*, 328

---

[4]

The Court is at a complete loss to understand the Government's statement that the "defense motion did not even mention the calls." ECF No. 81 at 15.

[5]

The Government was in as good a position, if not better, than Defendant to know on which dates it intercepted phone conversations between Defendant and the Government's informant.

F.3d 974, 978 (8th Cir. 2003).

The Court expressly rejects the Government's suggestion that the motion be denied without prejudice and to allow the defense to refile it prior to trial. Contrary to the suggestion made in footnote seven of the Government's memorandum, there is nothing burdensome about requiring the Government to prove, at the suppression hearing, the admissibility of the phone calls it intercepts. It is what the law has always required. The Court concludes that the issue of the admissibility of the December 28, 2016, and January 2, 2017, phone calls shared between Katie Reyes and CI-13 was clearly and timely raised in advance of the suppression hearing. The suppression hearing on May 25, 2017, provided time for the Court to receive evidence on the admissibility of these conversations. The Court will now decide the merits of Katie Reyes' motion suppress electronic surveillance. *See* ECF No. 59.

"Title I of the Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, Title I, 100 Stat. 1851,4 regulates the interception of wire, oral and electronic communications." *Corona-Chavez*, 328 F.3d at 978 (citing 18 U.S.C. § 2510–22). "Title I provides that it is not unlawful to intercept such a communication if a party to the communication has given prior consent to the interception. Nor does such an interception violate the Fourth Amendment." *Id.* (citing *United States v. White*, 401 U.S. 745, 753 (1971); 18 U.S.C. § 2511(2)(c)). "The government bears the burden of proving consent." *Id.* "Consent may be express or implied, but in either case, there must be actual consent." *Id.* (citing *Deal v. Spears*, 980 F.2d 1153, 1157 (8th Cir.1992)). "When someone voluntarily participates in a telephone conversation knowing that the call is being intercepted, this conduct supports a finding of implied consent to the interception." *Id.* (citing *United States v. Horr*, 963 F.2d 1124, 1125 (8th Cir.1992)).

Here, there is no dispute that CI-13 was a party to the contested December 28, 2016, and

January 2, 2017, intercepted phone calls. The question is whether the Government has offered proof that she consented to the interception of these calls. *See Corona-Chavez*, 328 F.3d at 978. Testimony at the hearing established that CI-13 agreed to make these calls, and that the calls were recorded. However, testimony also established that law enforcement was not certain whether CI-13 was aware that the contested calls were recorded. More important, testimony established that it was not certain whether CI-13 was aware the that the contested calls were *intercepted*. Indeed, when CI-13 signed the various forms to become a Task Force informant, the forms did not include information "about recording of telephone calls or interception of communications or anything like that." ECF No. 73 at 196. In addition, the Government has not offered evidence that the contested calls used a visible recording device or other external technology from which the Court could infer consent to the interception. *See, e.g., Cornoa-Chavez*, 328 F.3d at 977 (reasoning that consent to interception could be implied through the use of "two recording devices: a microphone in the video camera and a body wire on [the informant]."). Because the Government has not carried its burden to show that the interception of the contested calls was consented to by CI-13, Katie Reyes' request that the December 28, 2016, and January 2, 2017, calls be suppressed must be granted. *See Deal*, 980 F.2d at 1157.

### D.     Motion for a Franks Hearing (ECF No. 61)

Katie Reyes "challenges the validity of the warrant authorizing" the Lincoln search "after the traffic stop on the ground that it [was] not supported by probable cause." ECF No. 80 at 14. Her "probable cause challenge relies on a motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), because the affidavit submitted in support . . . of the warrant contained both material omissions and false statements that were either intentional or made in reckless disregard for the truth." *Id.* Antonio Reyes separately "challenges the validity of the search warrant under

*Franks v. Delaware*, 438 U.S. 154 (1978), . . ." Antonio Reyes' Mot. to Supp. 1, ECF No. 50. The Government argues that Defendants' request for a *Franks* hearing "has no basis in fact." ECF No. 81 at 9.

> In order to prevail on a challenge to a warrant affidavit under *Franks v. Delaware*, [438 U.S. 154 (1978),] a defendant must show: 1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit, and 2) that the affidavit's remaining content is insufficient to establish probable cause. The same analysis applies to omissions of fact. The defendant must show: 1) that facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading, and 2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.

*United States v. Humphreys*, 982 F.2d 254, 259 n.2 (8th Cir. 1992) (citing *United States v. Lueth*, 807 F.2d 719, 726 (8th Cir. 1986); *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir. 1986)).

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks*, 438 U.S. 155–56. An affiant acts with reckless disregard for the truth if he "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995).

Here, Abrahamson attested in the supporting affidavit attached to the Lincoln search warrant that "Trooper Westbrook advised your affiant that his certified K-9 partner Skippy alerted on the vehicle. Trooper Ignaszewski advised your affiant that his certified K-9 partner Jery also alerted on the vehicle." ECF No. 66, Gov't Ex. 3 at 1-5. Although Defendants claim that Skippy and Jery's alerts failed to satisfy a showing of probable cause, the record does not support a finding that Abrahamson falsely included facts relating to the canine sniffs or that the troopers did not actually

report that Skippy and Jery alerted. *See Humphreys*, 982 F.2d at 259 n.2. In addition, there is no information in this case to suggest Abrahamson, as the affiant, entertained serious doubts about the information he included in the Lincoln search warrant affidavit or "had reasons to doubt the accuracy" that the dogs alerted. *Clapp*, 46 F.3d at 801 n.6. This is particularly unlikely given that Westbrook was in constant contact with the Task Force regarding the traffic stop, and the Lincoln search warrant affidavit was filed within hours of the traffic stop. In fact, testimony at the hearing established that Westbrook was present while Abrahamson prepared the Lincoln search warrant affidavit. *See* ECF No. 73 at 26.

Defendants argue that Abrahamson's failure to attest that the dogs did not indicate constituted a reckless omission. *See* ECF No. 80 at 20. In *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993), the Eighth Circuit held that the affiant's attestation that the dog showed an "interest in a package" without stating that the dog failed to alert was a reckless omission given that the affiant knew that the dog had failed to alert, and "any reasonable person would have known that this was the kind of thing [reviewing] Judge would wish to know." Here, there is no evidence that Abrahamson, the affiant, knew the dog's failed to indicate. Testimony at the hearing established there was no "distinction drawn by anyone" present while Abrahamson drafted the affidavit "concerning an alert versus and indication[,]" troopers simply stated that Skippy and Jery alerted, and "that's what Abrahamson included in the warrant." ECF No. 73 at 27. Moreover, whether Skippy and Jery failed to indicate, as opposed to alerting, in this case is not something that a reasonable person would have known "that . . . [the reviewing Judge] would wish to know." *Jacbos*, 986 F.2d at 1235. Unlike the dog in *Jacobs*, Skippy and Jery did not merely show an interest in the Lincoln, rather both dogs "alerted" to vehicle's driver's side rear – an observable change in the dogs' behavior – from which troopers are "trained to draw conclusions." ECF No. 73 at 138.

19

Because Defendants have failed to make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" their request for a *Franks* hearing must be denied. *Franks*, 438 U.S. 155–56.

## IV. RECOMMENDATION

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Antonio Reyes' motion to suppress search and seizure (ECF No. 50) be **DENIED**.

2.  Antonio Reyes' motion to suppress statements (ECF No. 51) be **DENIED as moot**.

3.  Katie Reyes' motion to suppress statements (ECF No. 56) be **DENIED as moot**.

4.  Katie Reyes' motion to suppress identification (ECF No. 57) be **DENIED as moot**.

5.  Katie Reyes' motion to suppress search and seizure (ECF No. 58) be **DENIED**.

6.  Katie Reyes' motion to suppress electronic surveillance (ECF No. 59) be **GRANTED**.

7.  Defendants' joint request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), (ECF No. 61) be **DENIED**.


DATED: July 31, 2017

                                                     *s/Franklin L. Noel*

                                                     _____

                                                     FRANKLIN L. NOEL
                                                     United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 14, 2017**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to

3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **August 14, 2017**, a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.